No. 89,013

STATE OF KANSAS, *Appellee*, v. JEREMY ALLEN NORTON, *Appellant*.

(85 P.3d 686)

Opinion filed March 19, 2004.

*Nathan B. Webb*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Don L. Scott*, county attorney, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Jeremy Norton was convicted by a jury of one count of possession of methamphetamine with intent to sell, one count of possession of methamphetamine, and one count of possession of marijuana. He was sentenced to a controlling term of 42 months' imprisonment. Norton appealed his convictions and sentences. In an unpublished opinion filed August 29, 2003, the Court

of Appeals affirmed. This court granted Norton's petition for review.

Norton raises two issues on appeal:

1. DID THE TRIAL COURT ABUSE ITS DISCRETION IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL BASED ON THE NEWLY DISCOVERED EVIDENCE OF THE INFORMANT'S ARREST FOR DRUG ACTIVITY?

2. DID THE TRIAL COURT VIOLATE DEFENDANT'S CONSTITUTIONAL RIGHTS AS ENUNCIATED IN *APPRENDI* WHEN IT USED A PRIOR JUVENILE PERSON FELONY IN CALCULATING DEFENDANT'S SENTENCE?

Alfredo Gomez started working as a confidential informant in the mid-1990's after he was arrested for manufacture of crack cocaine. Following his arrest by the Liberal police, he agreed to work for Officer John Schnoor as a paid informant. His job was to get people to sell him drugs so they could be charged with drug offenses. Gomez acted as a confidential informant continually from when he began working for Officer Schnoor until the time of Norton's trial on January 24-25, 2002. He estimated that he had worked with authorities on 25 to 30 cases.

Norton and Gomez had been friends since grade school. Gomez testified that in June 2001, Norton, while visiting in Liberal, asked him if methamphetamine would sell there. Gomez told him it would. Norton asked Gomez about the local price and if Gomez could sell some methamphetamine if Norton were to bring it to Liberal. Gomez said he could. Later, they had several telephone conversations.

On July 7, 2001, Norton checked into a motel in Seward County. His vehicle had a Nebraska license plate. Norton testified that he was in Liberal on that date to visit his brother, niece, and nephews.

Gomez testified that when Norton telephoned him to say he was in town, Gomez went to the motel room and talked with Norton. According to Gomez, Norton said that he brought methamphetamine with him to sell, and Gomez told Norton to give him some time to get the money and he would buy an ounce.

Gomez testified that when he was unable to reach his KBI handler, he called John Schnoor. Schnoor was a sheriff's deputy with

primary duties in narcotics investigation. While working as a narcotics detective for the Liberal police, he had arrested Gomez and "rolled him over to work . . . as an informant." Gomez told Schnoor that Norton was in a motel in Liberal holding 2 ounces of methamphetamine for distribution. Schnoor told Gomez to purchase one ounce at $1,000 at the motel room and to set up a later controlled purchase away from the motel room to facilitate the arrest of Norton.

Before Gomez went to Norton's motel room, Schnoor searched him and his vehicle. Even though informants were required to wear recording devices in 95-99% of cases, Schnoor did not put a recording device on Gomez due to Gomez' concern that Norton would at least pat him down in the motel room. Schnoor photocopied the currency before giving it to Gomez and followed him to the motel. Schnoor watched from across the street. After a short time, Gomez came out of the room, got into his vehicle, and drove back to the meeting place with Schnoor. Gomez handed Schnoor "a bag containing rocks." Back at his office, Schnoor field tested the rocks, which were positive for methamphetamine. Schnoor searched Gomez and his vehicle. Gomez told Schnoor what had taken place in the room, and Schnoor asked questions about the contents of the room in preparation for applying for a search warrant. Gomez said that Norton had a pit bull dog and a travel bag with him in the room.

Schnoor further testified that on the evening of July 7 he received a cell phone call from Gomez advising that he had arranged by telephone with Norton to have him bring the other ounce of methamphetamine to a car wash. No recording was made of Gomez' telephone conversation with Norton. Schnoor notified other sheriff's deputies to stop Norton's vehicle. Norton was stopped and a white rock in a plastic bag was found in his right front pocket, and he was arrested. The rock material tested positive for methamphetamine.

Schnoor got a search warrant for Norton's motel room. Animal Control removed the dog, and the sheriff's deputies searched the room. They found more methamphetamine, some marijuana, and $1,700. One thousand dollars of the money was money Schnoor

had photocopied. They also found a knife, some plastic bags, and ledger notes with names and numbers that Schnoor believed to be an account of drug transactions.

Gomez testified that when he went to Norton's motel room to buy the first ounce of methamphetamine, he told Norton that there were a couple of other men who were driving to Liberal for the other ounce and that they would arrive in an hour or two. Gomez told Norton that he was going over to a friend's house for a barbeque and that he would meet Norton at the car wash later. After going to the barbeque, Gomez talked to Schnoor and then called Norton to tell him to come to the car wash. Norton agreed. He was arrested between the motel and the car wash.

Norton's theory of defense was that Gomez framed him by first bringing drugs and then money into his motel room and finally getting Norton to deliver some of the drugs to Gomez at another location. Norton testified that Gomez contacted him before he went to Liberal and asked him to bring some drugs with him. He saw Gomez before he checked into the motel. Norton was driving, and he saw Gomez standing on a friend's porch. Norton stopped and they talked about hanging out together. Norton testified that he had with him about $700, which he had earned painting a house. He denied taking any drugs into the motel room with him.

Norton testified that Gomez brought baggies of what Norton thought might be cocaine or methamphetamine when he came to the motel room. Gomez asked if he could leave it in Norton's room, and Norton said he could. Gomez put it in the drawer in the desk. Then they drove to Gomez' house, where he got a scale and some marijuana. He gave the marijuana to Norton. They went back to the motel room, and Gomez weighed one of the rocks from the drawer. It weighed 3 ounces, and he took it with him when he left. Gomez said he would be back in a little bit. When he returned approximately 30 minutes later, Gomez had some money in his hand. Norton counted the money, as Gomez told him to do. It was $1,000. Gomez asked if he could leave it there, and Norton laid it on the desk. Gomez took the other baggie and left, saying he would telephone in about an hour. Later Gomez called and said to bring the "toy" (the methamphetamine) to the car wash. Norton was

stopped by police as he was driving to the car wash. He had the methamphetamine that he was taking to Gomez in his right pocket.

Norton was charged with sale of methamphetamine, possession of methamphetamine with intent to sell, possession of methamphetamine, and possession of marijuana. The jury found Norton not guilty of sale of methamphetamine.

We first consider whether the trial court abused its discretion in denying defendant's motion for new trial based on the newly discovered evidence of Gomez' arrest for drug activity.

Appellate review of a trial court's order under K.S.A. 22-3501(1) on a motion for new trial based on newly discovered evidence is whether the trial court abused its discretion. *State v. Thomas*, 257 Kan. 228, 229, 891 P.2d 417 (1995). K.S.A. 22-3501(1) also provides that a trial "court on motion of a defendant may grant a new trial to him if required in the interest of justice."

The new evidence on which Norton based his motion for new trial was that Gomez, the confidential informant who testified that he and Norton engaged in one drug sale and intended to transact another, was arrested for crimes involving methamphetamine with intent to sell. The trial court found that Gomez came under investigation on February 5, 2002, less than 2 weeks after Norton's trial was completed on January 25, 2002. Gomez was arrested on February 9, 2002.

The evidence at the hearing on the motion for new trial showed that law enforcement officers had reason to suspect that Gomez was involved in drug trafficking at least by January 28, 2002. KBI Agent Kevin Campbell testified that when he was in Liberal on January 28 testifying in a preliminary hearing, an unidentified "cooperating individual" told Campbell that he could buy narcotics from Gomez. On February 5, 2002, when Campbell and other KBI agents were again in Liberal, the "cooperating individual" made a controlled telephone call to Gomez about purchasing narcotics.

Campbell was surprised that Gomez was selling drugs because Gomez was supposed to be working for him at that time. Campbell testified that around Christmastime 2000, a suspect, who Campbell—working as an undercover agent—wanted to buy marijuana from, went to Gomez' house to get the marijuana to sell to Camp-

bell. Campbell learned from Schnoor that it was Gomez' house. When Schnoor and Campbell talked to Gomez, he "admitted that he was given an X amount of drugs to give to this guy later on." Gomez turned over to Schnoor and Campbell the remaining quarter pound of marijuana that he had at his house. After this incident, Gomez became a KBI informant in order "to work those charges off." Approximately 2 months later, in February or March 2001, Campbell actually signed up Gomez as a confidential informant.

The test for determining whether a new trial is warranted on the ground of newly discovered evidence has two parts. *Thomas*, 257 Kan. at 231. The first is whether the defendant has met the burden of establishing that the newly proffered evidence could not with reasonable diligence have been produced at trial. The second is whether the evidence is of such materiality that it would be likely to produce a different result upon retrial.

In this case, there is no doubt that the newly discovered evidence could not have been produced at trial. Evidence of Gomez' arrest could not have been produced at trial because neither the investigation nor arrest of Gomez occurred until after Norton's conviction.

Without citing authority, the Court of Appeals took its analysis a step further than the accepted test and stated that the evidence of Gomez' illegal activity was not "newly discovered evidence" because it occurred after Norton's trial was completed and, thus, was not evidence that could have been used at trial. The State suggests no legal basis for limiting newly discovered evidence to preverdict occurrences. In the absence of some statutory or case law support for adding a condition to the well-recognized test, Norton's complaint about the Court of Appeals' redefining "newly discovered evidence" appears to be valid.

In this case, the second part of the test, whether the new evidence is of such materiality that it would likely produce a different outcome, is the pivotal issue. In this regard, the Court of Appeals stated:

"Even if this court were to consider such evidence as being newly discovered evidence, its only relevance would be to impeach or discredit Gomez' testimony. See *State v. Richard*, 235 Kan. 355, 363, 681 P.2d 612 (1984) ("A new trial is not

granted on the basis of newly discovered evidence which merely tends to impeach or discredit the testimony of a witness."). Evidence of Gomez' subsequent drug activity would not produce a different result upon retrial because the jury was already fully aware that Gomez was working as a confidential informant because of his arrest for drug activity.

. . . .

". . . Even if the jury had known Gomez was dealing drugs, it would not have changed the evidence that Norton sold Gomez drugs and Norton was prepared to make another sale when the police stopped him. Thus, even if this evidence had been presented to the jury, any evidence of Gomez' drug dealing for his own profit was not of such materiality that there is a reasonable probability it would produce a different result upon retrial." Slip op. at 1-2.

Norton disagrees with the Court of Appeals' view of the impact that evidence of Gomez' arrest for methamphetamine offenses would have on a jury. He contends that not only would the evidence discredit Gomez' testimony, but there is a reasonable probability that the new evidence would produce a different result because the State presented so little direct evidence of Norton's guilt.

The parties have cited no cases involving the question whether the subsequent misconduct of an informant is enough to require a new trial. A search for Kansas cases involving that question revealed only one case in which a motion for new trial was based on the conduct of an informant, *State v. Deffenbaugh*, 216 Kan. 593, 533 P.2d 1328 (1975). *Deffenbaugh*, however, is not a case in which the informant subsequently engaged in illegal activity. Deffenbaugh sought a new trial when he discovered that the informant, in a proceeding in another county, had testified that he was a confidential police informant. The motion was denied because the informant's testimony in Deffenbaugh's trial "clearly showed that he was the confidential informant." 216 Kan. at 601. *Deffenbaugh* offers no particular guidance for the present case.

A search for federal cases on this question produced several in which the post-trial misconduct of an informant was the basis for a motion for new trial. In *United States v. Leon-Lopez*, 891 F. Supp. 138 (S.D.N.Y. 1995), the federal district court overruled motions for new trial which were based on evidence of one informant's conviction of theft of government property ($700,000) and another agent's being reduced to limited duty as a result of his sexual re-

lationship with a drug trafficker. Several factors were weighed by the court. First, the evidence was unrelated to the undercover investigation and irrelevant to the case before the court. 891 F. Supp. at 149. In this regard, the court remarked that allowing "cross-examination into this post-trial conduct . . . would open the door to new trial motions whenever a government witness committed a bad act or was convicted of criminal conduct occurring subsequent to trial, no matter how remote in time, place and subject matter to the original action." 891 F. Supp. at 149. Second, the evidence of post-trial conduct would be inadmissible under Federal Rule of Evidence 608(b), which provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, . . . may not be proved by extrinsic evidence." 891 F. Supp. at 149. Third, even if the evidence of the agents' misconduct were admissible, a new trial was not required because "the new evidence would only be used to impeach the agents' credibility in general, and could not be used to impeach their credibility as to any specific statement or issue of fact. Thus, the defendants offer no evidence to contradict the agents' version of the facts in this case." 891 F. Supp. at 149. The trial court concluded its discussion by stating: "Moreover, the agents' testimony was extensively corroborated by other evidence at trial," 891 F. Supp. at 149, and setting out the corroborating evidence. 891 F. Supp. at 149-50.

In *United States v. Orellana-Osorio*, 1998 WL 799164 (S.D.N.Y. 1998), the court overruled defendant's motion for new trial, which was based on the informant's posttrial arrest for drug possession. The court likened the motion before it to the motion in *Leon-Lopez*. Orellana argued that the conviction of Sanchez, the informant who testified against him, "would tend to show the existence of on-going criminal acts by Sanchez which in turn proves that he lied at Orellana's trial." Slip op. at 2. Because there was no evidence that Sanchez committed perjury during Orellana's trial and Sanchez's subsequent conviction was unrelated to his original testimony, evidence of the conviction would not serve to contradict Sanchez's testimony. The court stated that use of the new evidence for impeachment purposes only was not a valid reason for a new

trial. The court concluded its discussion by stating: "Furthermore, Sanchez's testimony was extensively corroborated by other evidence at trial." Slip op. at 3. In consequence, the court found "that the newly discovered evidence possibly impeaching Sanchez would not have materially altered the outcome of the trial." Slip op. at 3.

In *United States v. Sposato*, 446 F.2d 779, 780 (2d Cir. 1971), the Court of Appeals affirmed the trial court's denial of defendant's motion for new trial, which was based on posttrial charges being filed against Peden, the Internal Revenue Agent who posed as a would-be bettor and then was chief witness against Sposato. Noting that evidence of charges against Peden would be inadmissible, the court stated that, even if admissible, the evidence was "most unlikely" to produce an acquittal. 446 F.2d at 782. Use of the new evidence to impeach or discredit Peden was held not to warrant a new trial. 446 F.2d at 781. The court stated: "Nothing is offered to contradict Peden's version of the facts; which was, moreover, corroborated at trial by another witness." 446 F.2d at 782.

In *United States v. Spencer*, 4 F.3d 115 (2d Cir. 1993), the Court of Appeals affirmed the trial court's denial of the motion for new trial of one of the defendants, Bloomer. He was convicted of manufacturing methamphetamine over a number of years in the chemistry laboratory in his home and distributing it through a certain network of individuals. His federal sentence calculation took into account the methamphetamine produced, which was based in part on the testimony of McMahon, a Vermont State Police forensic chemist, who testified he found traces of methamphetamine on lab equipment located in Bloomer's home. 4 F.3d at 118. After his conviction, Bloomer learned that McMahon "was relieved of duty because of the discovery that he had taken and used regulated drugs from the state police crime laboratory." 4 F.3d at 118. The discovery was the basis for a motion for new trial, which the district court denied on the ground that it was not probable that the impeachment of McMahon's credibility would lead to acquittal. The district court also noted that "[p]ersuasive independent evidence . . . supported [the] defendant's conviction." 4 F.3d at 118. The Court of Appeals agreed:

"The district court correctly found that '[p]ersuasive independent evidence . . . supported the defendant's conviction.' There was overwhelming testimony from six buyers of Bloomer's narcotic that established Bloomer's manufacture of methamphetamine. Furthermore, Fasanello's expert opinion indicated that the presence of certain chemicals, laboratory equipment, and Bloomer's notations could lead only to the conclusion that Bloomer was manufacturing methamphetamine. Because this evidence corroborated McMahon's testimony that Bloomer's home contained traces of the narcotic, the newly discovered evidence possibly impeaching McMahon would not have materially altered the outcome of the trial. Moreover, although the evidence may have impeached McMahon's credibility, it did not serve to contradict any of McMahon's conclusions or statements of fact." 4 F.3d at 119.

The common thread in these federal cases is the courts' consideration of the presence or absence of corroborating evidence as a factor in determining whether the newly discovered evidence is of such materiality that it is likely to produce a different result upon retrial. In *Leon-Lopez* and *Orellana-Osorio*, the court described the informants' testimony as "extensively corroborated." *Leon-Lopez*, 891 F. Supp. at 149; *Orellana-Osorio*, 1998 WL 799164, Slip op. at p. 3. In *Sposato*, the court noted that the agent's testimony was corroborated by that of another witness, 446 F.2d at 782; and, in *Spencer*, the Court of Appeals quoted the trial court's observation that the conviction was supported by persuasive independent evidence. 4 F.3d at 118.

The present case stands in contrast with the federal cases in its complete lack of corroborating evidence. The State's case against Norton on the methamphetamine sale and intent-to-sell charges was based on Gomez' testimony that Norton brought the methamphetamine with him to Liberal. Norton's defense was that all the methamphetamine was placed in his motel room by Gomez when Gomez visited him before informing Deputy Schnoor that Norton was in town in possession of methamphetamine. Although Schnoor patted Gomez down and searched his vehicle before and after Gomez visited Norton's motel room the second time in order to be able to show that the methamphetamine in the motel room was there when Gomez went in, Schnoor's efforts were nullified as corroborating evidence by Gomez' testimony that he went to the motel room before contacting Schnoor. A recording device on

Gomez when he went to Norton's room might have provided corroborating evidence, but Schnoor allowed Gomez to go without one. Likewise, a recording device was not used for telephone conversations between Gomez and Norton. The State, as a result, was unable to report their communications, was unable to corroborate Gomez' testimony that Norton was the supplier of the methamphetamine, and unable to demonstrate control over the "controlled" buy. An informant making a controlled buy without wearing a recording device does not necessarily seriously weaken the State's case, but, in the circumstances of this case, it eliminated potential corroborating evidence.

In the present case, as the Court of Appeals said, evidence of Gomez' arrest on drug trafficking charges might impeach or discredit Gomez' testimony but would not directly contradict Gomez' testimony. Also, as the Court of Appeals stated, the jury was aware that Gomez was working as an informant because he had been arrested several years earlier for drug activity. Slip op. at 1. The jury was not aware, however, that Gomez was involved in drug trafficking at or near the time of the transaction with Norton, or at Christmastime 2000. In the present case, unlike *Leon-Lopez* where the agents' subsequent misconduct was unrelated and irrelevant to the movants' convictions, Gomez' current drug trafficking lends support to his having access to quantities of controlled substances, which was a key element in Norton's defense that Gomez was the source of the methamphetamine and marijuana Norton was charged with selling and possessing. The factfinder could reasonably conclude that Gomez has been actively and continually involved in drug trafficking from 6 months prior to the transaction with Norton up to the time of Norton's trial.

In this case, unlike the federal cases we have reviewed, there was no independent evidence to corroborate Gomez' testimony. In the peculiar circumstances of this case, although evidence of Gomez' arrest would not contradict his testimony, it seems likely that it would produce a different result. For that reason, Norton's motion for new trial should have been granted, at least in part.

Although the State does not contend that a new trial, if one were granted, should be limited, it appears that a new trial should not

be granted for the simple possession convictions. The simple possession convictions may stand because neither depends on Gomez' testimony. The evidence supporting Norton's conviction of possession of marijuana was that marijuana was found in the search of his motel room. Norton's testimony that Gomez gave it to him supports rather than undermines a determination that Norton possessed marijuana. The evidence supporting Norton's conviction of possession of methamphetamine was that it was found in the search of his motel room. Given the broad definition of possession of a controlled substance, see PIK Crim. 3d 67.13-D, Norton's testimony that he gave Gomez permission to store methamphetamine in the motel room would satisfy the elements of the offense and would not be affected by Gomez' testimony or evidence of his subsequent misconduct. Thus, the only conviction subject to new trial would be possession with intent to sell, which arose out of Norton's transporting methamphetamine from the motel room to the car wash. The only evidence that Norton intended to sell the methamphetamine was Gomez' testimony. The trial court erred in failing to grant Norton's motion for a new trial as to the possession of methamphetamine with intent to sell.

The second issue raised by Norton is whether in calculating his sentence the trial court violated *Apprendi v. New Jersey*, 530 U.S. 466, 17 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

On this issue, the Court of Appeals stated:

"Norton had a criminal history of C based in part on one juvenile person felony. Although he acknowledges this issue was decided in *State v. Hitt*, 273 Kan. 224, 42 P.3d 732 (2002), *cert. denied* 537 U.S. 1104 (2003), he argues the inclusion of the juvenile felony was unconstitutional under *Apprendi*. The *Hitt* court specifically held: 'Juvenile adjudications need not be charged in an indictment or proven to a jury beyond a reasonable doubt before they can be used in calculating a defendant's criminal history score under the Kansas Sentencing Guidelines Act.' 273 Kan. 224, Syl. ¶ 2. Thus, the trial court did not violate *Apprendi* when it included Norton's juvenile felony, increasing his sentence." Slip op. at 2.

Norton concedes that *Hitt* governs this issue. He asks that *Hitt* be overruled. We decline to do so.

The judgment of the Court of Appeals and the district court is affirmed in part, reversed in part, and the case is remanded to the

district court for a new trial on the possession of methamphetamine with intent to sell count.

BEIER, J., not participating.

BRAZIL, S.J., assigned.