UNITED STATES of America,

v.

**Guillermo LEON–LOPEZ, a/k/a "El Negro," Jairo Alvarez–Buitrago and Ivan Alvarez–Buitrago, Defendants.**

No. 91 Cr. 73 (SWK).

United States District Court,
S.D. New York.

June 21, 1995.

Mary Jo White, U.S. Atty. S.D.N.Y., New York City by Asst. U.S. Atty., Bruce G. Ohr, for U.S.

Richard A. Canton, New York City, for defendant Guillermo Leon–Lopez.

Andrew Patel, New York City, for defendant Jairo Alvarez–Buitrago.

Kenneth Paul, New York City, for defendant Ivan Alvarez–Buitrago.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

On October 8, 1992, defendants Guillermo Leon–Lopez ("Lopez"), Jairo Alvarez–Buitrago ("Jairo") and Ivan Alvarez–Buitrago ("Ivan")[1] were convicted of conspiracy to possess cocaine, in violation of 21 U.S.C. § 846, and possession of cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Currently before the Court is defendants' motion for a (1)

---

1. Jairo and Ivan shall be referred to collectively as the "Buitragos."

new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure; or (2) judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29. For the reasons that follow, defendants' motion is denied.

## BACKGROUND

On June 13, 1991, Lopez, Ivan and Jairo were charged in a two-count Indictment with conspiracy to possess cocaine and possession of cocaine with intent to distribute it. Trial commenced on March 24, 1992 and ended in a hung jury.[2] Subsequently, on September 14, 1992, defendants again proceeded to trial and, on October 8, 1992, all three defendants were convicted of both counts of the Indictment.

## I. Evidence at Trial [3]

At the second trial, the evidence established that, commencing in October 1990, Rene De La Cova ("Agent De La Cova") and Robert Matos ("Agent Matos"), former special agent and special agent of the Drug Enforcement Administration ("DEA") respectively, posed as cocaine smugglers during a DEA investigation into the transportation of cocaine from Panama to New York (the "undercover investigation"). In their undercover capacity, Agents De La Cova and Matos met with Ceferino Villamil ("Villamil"), a cocaine broker residing in Panama. Agent De La Cova and Villamil agreed that Agent De La Cova would transport approximately 400 to 500 kilograms of cocaine from Panama to New York. Tr. at 89. Pursuant to this agreement, in November 1990, undercover DEA agents received approximately 307 kilograms of cocaine in Panama, which they then transported to New York. Id. at 406–09. The next month, DEA agents received an additional 150 kilograms of cocaine, which they delivered to the Panamanian government. Id. at 90, 104, 409.

In January 1991, Agents De La Cova and Matos met with Fernando Arias ("Arias"), who was designated to oversee the distribution of the cocaine in New York. Id. at 92. The agents gave Arias a cellular telephone, upon which they had concealed an authorized wiretap. Id. at 413. From an intercepted conversation, the agents learned that a portion of the cocaine was designated for an individual identified as "El Negro," whose beeper number was (212) 458–0453. Id. at 109, 417.

Subsequently, on January 10, 1991, Agent De La Cova, posing as Arias, paged "El Negro" at the above telephone number and arranged to deliver ten kilograms of cocaine to him later that night. Id. at 118–19. At the pre-arranged time, Agents De La Cova and Matos met the defendants to effectuate the drug transaction (the "January 10th transaction"). Id. at 124–25. Lopez identified Jairo and Ivan as his workers and indicated that Jairo would drive the car containing the cocaine and that Ivan would transport Lopez in a different car. Id. at 125–27. Agents De La Cova and Matos then walked with Jairo to their vehicle and allowed him to inspect the cocaine. When Jairo attempted to drive away in the vehicle containing the cocaine, the agents arrested all three defendants. Id. at 129–30. After frisking Lopez and Ivan, the agents discovered that each of the defendants was carrying a beeper. Id. at 357–58. The telephone number that Agent De La Cova had called earlier that evening was typed on Lopez's beeper. Id. at 443. Ivan also was carrying a piece of paper upon which was written Lopez's beeper number and the name "Guillo." Id. at 443–44. When questioned by Agent Matos after his arrest, Ivan indicated that he knew that "someone"

2. Defendants mischaracterize the reason that the jury was deadlocked during the first trial, indicating that the jury lacked a consensus "on the issue of the chain of custody over the cocaine which [Lopez] had allegedly possessed at the time of his arrest." Mem. in Supp. of Def. Lopez's Rule 33 Mot. for a New Trial at 1–2. Contrary to defendants' assertion, however, the Court is unaware of the basis for the jury's failure to reach a verdict. In fact, the Court precluded the jury from revealing its position on any count prior to reaching unanimity, see Tr. of First Trial, commencing on Apr. 9, 1992, at 1054, and defendants point to no evidence that the jury revealed its standing as to any issue in the case.

3. Except where otherwise noted, the following facts are taken from the transcript of the second trial, commencing on Sept. 16, 1992 ("Tr.").

was there to do a cocaine deal and that after the cocaine deal they had planned to shop for shirts. *Id.* at 441. Jairo also stated that he had planned to shop for shirts. *Id.*

## II. Misconduct by Agent De La Cova[4]

During the second trial, defense counsel sought to cross-examine Agent De La Cova concerning two events: (1) allegations made by a female defendant in another case that Agent De La Cova had engaged in sexual relations with her during the course of that investigation; and (2) a trial in the Eastern District of Virginia during which Agent De La Cova was prevented from testifying because he had lied about the death of a confidential informant and the existence of certain audiotapes. After hearing argument from both sides, the Court ruled that defense counsel was precluded from cross-examining Agent De La Cova as to either of these incidents.

After their convictions, on August 17, 1993, defendants moved for a new trial on the ground that the Court erred in precluding them from cross-examining Agent De La Cova regarding his alleged prior bad acts. By Order dated September 20, 1993, however, the Court denied defendants' motion. Specifically, the Court indicated that:

> Defense counsel's extensive cross-examination of Special Agent Rene De La Cova provided the jury with ample opportunity to assess the witness's credibility. Moreover, unconfirmed allegations of sexual misconduct and the facts concerning the prior case in Virginia were of "marginal relevance" and were clearly prejudicial.

*See* Memorandum Endorsed Order, dated Sept. 20, 1993.

Subsequently, on January 5, 1994, Agent De La Cova pled guilty in the United States District Court for the Southern District of Florida to stealing $700,000 in connection

with an unrelated investigation. He currently is serving a twenty-four month sentence of imprisonment.

## III. Misconduct by Agent Matos[5]

By letter dated July 7, 1994, the Government informed the Court in connection with an unrelated case that, in May 1993, Agent Matos had engaged in sexual relations on one or two occasions with a known cocaine trafficker. According to the Government, Agent Matos had also offered to confirm the woman's belief that two of her friends had been arrested and he entered their names in the DEA's computer. Agent Matos then informed the woman that her friends had been arrested. Agent Matos also discussed with the woman the possibility of helping to secure the release of her friend, who was incarcerated in Panama, although there was no evidence that he took any action to effectuate the individual's release. In any event, Agent Matos failed to report to the DEA that he had knowledge of the woman's drug trafficking activities.

On May 27, 1994, Agent Matos was placed on limited duty. Thereafter, on June 20, 1994, the United States Attorney's Office declined to prosecute Agent Matos and, instead, referred the matter to the OPR for administrative action. On July 18, 1994, the OPR recommended that Agent Matos be restored to full-duty status.

## IV. Current Motion

On August 15, 1994, Lopez moved for a new trial or judgment of acquittal on the grounds of ineffective assistance of counsel. In addition, all three defendants moved for a new trial or judgment of acquittal on the grounds of newly discovered evidence of agent misconduct.

---

4. The Court has reviewed, *in camera,* the DEA's personnel files and the Office of Professional Responsibility's (the "OPR") investigative files concerning Agent De La Cova. The Court concludes that the files contain neither admissible evidence nor information from which defense counsel properly could have attacked Agent De La Cova's credibility at trial. Accordingly, defendants' argument that the Government wrongfully failed to disclose related acts of agent misconduct is meritless.

5. The Court has reviewed, *in camera,* the DEA's personnel files and the OPR's investigative files concerning Agent Matos and concludes that they neither contain admissible evidence nor furnish information that would have been a basis for cross-examining Agent Matos at trial.

## A. Ineffective Assistance of Counsel

Lopez first contends that the Court should grant him a new trial because he received ineffective assistance of counsel during his second trial. Specifically, Lopez contends that his former attorney, Joel Cohen ("Cohen"), informed the Court several times during the course of the trial that his father was dying and that he was incapable of adequately representing Lopez at that time. In addition, Lopez contends that Cohen failed to cross-examine DEA Agent Thomas Harrigan ("Agent Harrigan") about the chain of custody of the cocaine used in the January 10th transaction. Lopez also points to the fact that Cohen refused to inquire into whether seven kilograms of cocaine could fit into the soft-sided briefcase used by the Government during the January 10th transaction.

Lopez contends further that Cohen rendered ineffective assistance of counsel by representing him despite a conflict of interest. Specifically, Lopez contends that, prior to taking on his case, Cohen previously had represented an individual named Jose Zapata ("Zapata"). Zapata had been charged with violating the narcotics laws stemming from the same investigation as Lopez and, ultimately, had pled guilty to the charges against him. During the course of his case, Zapata was represented by Ivan Fisher ("Fisher"), who rents office space to Cohen and was also represented by Cohen in an unrelated case. According to Lopez, Cohen's prior representation of Zapata and his association with Fisher created a conflict of interest rendering his representation constitutionally defective.

## B. Government Misconduct [6]

Lopez and the Buitragos contend that a new trial is warranted because the Court erred in precluding them from cross-examining Agent De La Cova about his alleged bad acts. Defendants also base their motion on newly discovered evidence, namely, the January 1994 conviction of Agent De La Cova and the placement of Agent Matos on limited duty in May 1994. Finally, defendants assert that a new trial or judgment of acquittal is mandated by the DEA agents' misconduct during the undercover investigation. Specifically, defendants make the following allegations of government misconduct.

### 1. Receipt of Jewelry and Money By Confidential Informants

Defendants first allege that Agents De La Cova and Matos failed to report that Ramiro Restrepo ("Restrepo") and Kresimir Sucic ("Sucic"), two of the intended recipients of the cocaine transported from Panama, gave a quantity of jewelry and cash to a confidential informant (the "First CI") during the course of the undercover investigation.[7] On December 13, 1990, Agents De La Cova and Matos, together with the First CI, met with Restrepo and Sucic at the Windows of the World restaurant in New York to discuss a drug transaction. During or after this meeting, Restrepo gave a quantity of jewelry to the First CI.

Defendants allege that Restrepo gave the First CI $90,000 worth of jewelry as partial payment for the cocaine that he expected to receive from the agents. The First CI confirmed that Restrepo had given him a quantity of jewelry in the parking garage after the meeting in the restaurant. The First CI indicated, however, that he told Restrepo that he would be interested in purchasing jewelry from Restrepo in order to sell it at a profit. According to the First CI, he informed Agent De La Cova of his receipt of the jewelry and Agent De La Cova instructed him to keep the jewelry transaction separate from the narcotics investigation. The First CI admits, however, that he never paid Restrepo for the jewelry.

Defendants further allege that Restrepo gave $10,000 in cash to the First CI at the Meadowlands racetrack. While the First CI concedes that he went to the racetrack with Restrepo and another CI (the "Second CI"), the First CI contends that neither he nor the Second CI received any money from Restre-

---

6. The following recitation of facts is based on a letter from Assistant United States Attorney Bruce G. Ohr to the Hon. Shirley Wohl Kram of 2/27/95, and supporting documents.

7. Restrepo and Sucic were indicted in a separate action.

po. Agent De La Cova recalls hearing from the Second CI, however, that the First CI received $10,000 in cash from Restrepo. According to Agent De La Cova, he confronted the First CI about this money, but the First CI denied having received any cash.

On January 8, 1991, Agents De La Cova and Matos again met with Restrepo and Sucic at an undercover apartment in Queens to discuss the distribution of the cocaine. Restrepo indicated that he could pay $30,000 as partial payment for the drugs and Agent De La Cova stated that he would give Restrepo twenty-five kilograms of cocaine the next day. *See* DEA Form 6 Report, prepared by Agent Matos on Jan. 15, 1991 and signed by him on June 17, 1991. A videotape of this meeting shows that Restrepo stated that he had given nearly $100,000 to the First CI, and that he also had given the First CI an additional $10,000 "no questions asked." Agent De La Cova replied that anything between Restrepo and the First CI was Restrepo's business and had nothing to do with Agent De La Cova.

Later that evening, Restrepo and Sucic delivered a quantity of cash to the Second CI. The next day, the Second CI delivered the cash to the agents, who later determined that the amount was $20,000. *See* DEA Form 453 Report, signed by Agent Matos on Mar. 4, 1991 (recording the receipt by the CI of $20,000 from Restrepo on January 8, 1991). Restrepo contends, however, that he delivered $30,000 in cash to the Second CI.

### 2. Importation of 150 Kilograms of Cocaine

Defendants next allege that the DEA agents actually imported 457 kilograms [8] of cocaine into the United States from Panama, rather than the 307 kilograms of cocaine that they reported to the Government. Lopez alleges further that Agents De La Cova and Matos, possibly assisted by other agents, distributed the extra 150 kilograms of cocaine for their own profit.

According to the Government, however, although the DEA agents collected a total of 457 kilograms of cocaine in Panama, 150 kilograms of this total were delivered to the Panamanian government. In fact, a DEA Form 6 Report, signed by Agent Richard Fekete on Dec. 20, 1990, states that the 150 kilograms were relinquished to the Panamanian Policia Tecnica Judicial.[9] In addition, a report prepared by a Panamanian police inspector states that the drugs were turned over to the offices of the Fuerza Especial Antinarcotrafico of the Policia Judicial de Panama. *See* Mem. from Panamanian Inspector Ramiro G. Jarvis I to Panamanian Inspector Leslie E. Loaiza V (recording the receipt of 150 kilograms of cocaine from the DEA on January 9, 1991).

The transfer of 307 kilograms of cocaine from Panama to the United States also is recorded in DEA documents. Specifically, DEA Agent Michael Quigley ("Agent Quigley") drafted a DEA Form 6 Report, prepared on Dec. 17, 1990 and signed on Dec. 18, 1990, in which he records the transportation of 307 kilograms of cocaine from Panama to South Carolina and then to New York on December 11–12, 1990. Agent Quigley further reports that other DEA Group 34 agents met him at the Westchester County Airport on December 12, 1990 and escorted him and the cocaine to the DEA offices in New York. The cocaine was then placed in the evidence vault, where the receipt of ap-

---

**8.** Defendants contend that the Government actually received a total of 457.5 kilograms of cocaine from drug traffickers in Panama, but that it has omitted one-half of a kilogram of cocaine from its total calculations. *See* Def.'s Reply in Supp. of Post Trial Mots. at 6. Lopez fails to submit any evidence, however, that DEA agents received more than the 457 kilograms of cocaine documented.

**9.** Defendants contend that the DEA Form 6 Report lacks credibility because it states that it was prepared on December 9, 1990, yet it describes events that occurred on December 13–14, 1990.

While it is true that page one of the DEA form states that it was prepared on December 9, 1990, however, page two of the report indicates that it was prepared on December 19, 1990. Moreover, the form was not signed until December 20, 1990 and approved until February 1, 1991. In addition, the DEA form clearly states that its subject is the "[a]cquisition of 150 [k]ilograms [c]ocaine on 12/14/90." Accordingly, the Court concludes that there is no evidence that the December 9th date consists of anything more than a mere clerical error.

proximately 307 kilograms of cocaine was recorded. *See also* DEA Form 7a Report, signed by Agent Matos on June 12, 1991 (recording transportation of approximately 307 kilograms of cocaine from Panama to New York on December 10, 1990).

In support of their contention that 457 kilograms of cocaine were shipped from Panama to New York, defendants point to intercepted telephone conversation # 622 (Gov't Exh. 7A), recorded at 7:10 p.m. on January 8, 1991. Specifically, Lopez claims that Arias can be heard in the background of this intercepted conversation telling an unidentified male that he had counted more than 400 kilograms of cocaine in New York. The Government claims, however, that this background conversation is inaudible. In addition, the Government contends that Lopez's allegation is belied by a telephone call intercepted earlier that afternoon (conversation # 599, Gov't Exh. 6A, recorded at 4:29 p.m. on Jan. 8, 1991) during which Arias stated that he had not seen the 150 kilograms of cocaine containing a horseshoe identification.

Finally, Lopez alleges that the presence of the 150 kilograms of cocaine in New York is proven by the fact that some of the DEA's photographs of the drugs show cocaine contained in white packaging. According to the Government, however, a portion of the 307 kilograms of cocaine that the DEA agents transported from Panama also was wrapped in white packaging.

### 3. Theft of $300,000 from Vicky

On January 8, 1991, Group 34 agents observed a meeting between Arias and an individual identified as "Vicky" during which they arranged for the distribution of a quantity of cocaine. That same day, DEA agents intercepted a telephone call between Arias and Jorge Rodriguez–Orejuela ("Rodriguez–Orejuela"), Arias's superior in Colombia, during which Arias was instructed to look for "Vicky" and to give her 50 kilograms of cocaine in exchange for $300,000. DEA agents also intercepted a telephone call between Vicky and Arias during which they agreed to meet the next morning to effectuate the transaction.

The next day, Agent Matos met with Arias at the undercover apartment, where they placed twenty-five kilograms of cocaine in a DEA undercover van. Agent Matos then drove the van to the meeting between Arias and Vicky. At approximately 10:10 a.m.,[10] Agent Matos, Arias, Vicky and her associate met at a McDonalds restaurant in Queens, New York.[11] Agent Matos and Arias gave Vicky and her associate the keys to the undercover van containing the cocaine. The unidentified man then drove the van away, followed by DEA surveillance agents.

After the meeting, Arias and Agent Matos returned to the undercover apartment and placed an additional twenty-five kilograms of cocaine into a suitcase. Arias and Agent Matos then loaded the suitcase into a car driven by one of Arias's associates and Arias and his associate drove off, followed by surveillance agents. The agents observed Arias and his associate deliver the suitcase to a residence in Queens. Arias and the associate then drove away. Rather than following Arias, however, the agents maintained surveillance on the residence while one agent obtained a search warrant. After obtaining the warrant, the agents searched the residence and recovered the suitcase containing the cocaine.

At approximately 10:57 a.m., the agents intercepted a telephone call in which Arias reported to Rodriguez–Orejuela that he had met with Vicky and would be meeting with her again to obtain the money. *See* conversation # 676, Gov't Exh. 8A, recorded on Jan. 9, 1991 at 10:57 a.m. Thereafter, at approximately 11:28 a.m., Vicky called Arias and told him that she had mistakenly locked the keys

10. The DEA Form 6 Report, prepared by Agent Harrigan on Feb. 15, 1991, indicates that Arias arrived at the McDonalds restaurant at approximately 9:55 a.m.

11. By letter dated January 14, 1991, the Government indicated that "[o]n or about January 9, 1991, at approximately 10:00 a.m., an undercover agent and Fernando Arias delivered a van containing fifty kilograms of cocaine to Jane Doe, a/k/a "Vicky" and an unidentified man at a McDonald's in Queens, New York." *See* letter from Assistant United States Attorney Theodore E. Chervin to the Hon. Robert J. Ward of 1/14/91, at 2–3 (the "Third Ten Day Report").

in the van. Agents maintained surveillance of the van for the rest of the day and, later that night, recovered the van containing the twenty-five kilograms of cocaine. Arias and Vicky were not arrested and they remain fugitives.

Defendants contend that Vicky gave Agent Matos $300,000 in cash at the meeting at the McDonalds restaurant and that Agent Matos converted this money to his personal use. In support of this contention, defendants point to the intercepted telephone conversation between Arias and Rodriguez–Orejuela during which Rodriguez–Orejuela instructed Arias to give Vicky twenty-five kilograms of cocaine, wait to be paid, and then give her another twenty-five kilograms of cocaine. According to defendants, this telephone conversation establishes that Arias was to give Vicky the drugs only if she paid for them in advance. Defendants also point to conversation # 676, during which Arias informed Rodriguez–Orejuela that he had not received any money from Vicky yet, but that he planned to meet with her later that day to procure the money. According to defendants, conversation # 676 establishes that Arias planned to meet with Vicky at the McDonalds restaurant to procure the money for the drugs. Finally, defendants claim that Group 34 agents deliberately permitted Vicky and Arias to escape arrest because they would have confirmed that Vicky had transferred $300,000 to Agent Matos.

The Government contends, however, that Lopez misunderstands the timing of events on January 9, 1991. In fact, a DEA Form 6 Report, prepared by Special Agent James Glauner on Jan. 14, 1991 and signed by him on Feb. 14, 1991, states that the meeting at the McDonalds restaurant took place at approximately 10:10 a.m. on January 9, 1991. At that time, Agent Matos transferred the van's keys to Vicky and her associate and the associate drove the van away, followed by Vicky in another car. No surveillance agent reported seeing any money transferred at that meeting.

About 45 minutes later, at 10:57 a.m., the agents intercepted the telephone conversation in which Arias told Rodriguez–Orejuela that he had not yet received the money from Vicky. According to the Government, this evidence confirms that Agent Matos had not received any money from Vicky. As for defendants' allegation that Agent Matos permitted Vicky and Arias to escape arrest in order to avoid detection of the $300,000 theft, the Government contends that the agents made several attempts to locate both Vicky and Arias but were unsuccessful.

### 4. Theft of $3,000 from Guillermo Montoya

Defendants also allege that Agents De La Cova and Matos stole $3,000 from an individual named Guillermo Montoya ("Montoya"), who was designated to receive some of the cocaine transported from Panama. On January 8, 1991, Agents De La Cova and Matos contacted Montoya and met with him at a Kentucky Fried Chicken restaurant in Queens. Montoya agreed to meet with the agents the next day and to bring a transportation fee in exchange for 40 kilograms of cocaine.

At approximately 2:30 p.m. on January 9, 1991, Agents De La Cova and Matos drove an undercover vehicle containing fifteen kilograms of cocaine to the meeting with Montoya. After speaking together, Agents De La Cova and Matos drove away in Montoya's vehicle. In the vehicle, the agents discovered a quantity of cash, which they later turned over to other Group 34 agents. Montoya attempted to drive the undercover vehicle, but was arrested. The cash was later counted and was found to total $47,000. *See* DEA Form 6 Report, prepared by Agent Harrigan on Feb. 15, 1991 and signed by him on May 14, 1991; *see also* DEA Form 453 Report, signed by Agent Matos on Mar. 4, 1991 (recording the seizure of $47,000 from Montoya's vehicle on January 9, 1991).

Lopez contends that Montoya informed him that he had brought $50,000 in cash to the January 9, 1991 meeting. According to Lopez, Agents De La Cova and Matos thus stole $3,000 from Montoya's cache. OPR agents interviewed Montoya, however, who indicated that Agents De La Cova and Matos had told him that he would have to bring $140,000 as a transportation fee in return for the cocaine. Montoya stated that his superi-

or had given him a brown bag containing money which he later forwarded to the agents. Montoya admits, however, that he never counted the money in the bag.

## DISCUSSION

### I. Standard for Judgment of Acquittal or New Trial

Defendants first move for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29. Rule 29 provides that a court shall order the entry of a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." Fed.R.Crim.P. 29. The defendant bears a heavy burden in challenging a conviction based on insufficient evidence. *United States v. Soto,* 959 F.2d 1181, 1185 (2d Cir. 1992); *United States v. Rivera,* 971 F.2d 876, 890 (2d Cir.1992). "A conviction must be upheld if, after viewing the evidence in the light most favorable to the government, and drawing all reasonable inferences in its favor, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Medina,* 944 F.2d 60, 66 (2d Cir.1991) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied,* 503 U.S. 949, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992). Thus, "'[a] jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it.'" *Id.* (quoting *United States v. Nersesian,* 824 F.2d 1294, 1324 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987)).

In the alternative, defendants move for a new trial, pursuant to Federal Rule of Criminal Procedure 33. Rule 33 provides: "The court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice." Fed. R.Crim.P. 33. In exercising its discretion pursuant to Rule 33, the court is "entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992) (quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980)). The court may intrude upon the jury's as-

sessment of credibility, however, only in exceptional circumstances. *Id.* at 1414; *see also Romero v. United States,* 28 F.3d 267, 268 (2d Cir.1994) (stating that a district court may grant a motion for a new trial only in the most extraordinary circumstances); *United States v. Spencer,* 4 F.3d 115, 118 (2d Cir.1993) (same). Thus, the court should exercise its discretion sparingly, and new trials "should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *United States v. Rush,* 749 F.2d 1369, 1371 (9th Cir.1984) (quoting *United States v. Pimentel,* 654 F.2d 538, 545 (9th Cir.1981)).

In the case of newly discovered evidence, the court may provide relief only where the defendant makes a showing that the evidence could not have been discovered, in the exercise of due diligence, before or during trial, and that the evidence is so material and noncumulative that its admission would probably lead to an acquittal. *United States v. Spencer,* 4 F.3d at 119; *United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir.1992) (quoting *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980)). The Second Circuit has expressly held that the discovery of new evidence that merely discredits a government witness, but does not contradict the government's case, ordinarily does not warrant a new trial. *United States v. Spencer,* 4 F.3d at 119 (quoting *United States v. Sposato,* 446 F.2d 779, 781 (2d Cir.1971); *United States v. Aguillar,* 387 F.2d 625, 626 (2d Cir.1967)); *see also United States v. Reyes,* 49 F.3d 63, 68 (2d Cir.1995) ("New evidence that is merely impeaching will not ordinarily justify a new trial.").

### II. Lopez's Ineffective Assistance of Counsel Claim

Lopez first contends that he is entitled to a new trial because he received ineffective assistance of counsel. The Court disagrees.

As an initial matter, the Court notes that Lopez's ineffective assistance claim is untimely. In fact, Rule 33 of the Federal Rules of Criminal Procedure provides that motions for a new trial must be made within seven days after verdict except in the case of

newly discovered evidence. Fed.R.Crim.P. 33.[12] Ineffective assistance claims do not, however, present new evidence within the meaning of Rule 33. *United States v. Castillo,* 14 F.3d 802, 805 (2d Cir.) (citing *United States v. Dukes,* 727 F.2d 34, 39 (2d Cir. 1984)), *cert. denied,* —— U.S. ——, 115 S.Ct. 101, 130 L.Ed.2d 50 (1994). Thus, under Rule 33, Lopez had seven days from the date of his verdict to make a claim for a new trial based on the ineffective assistance of counsel. The Court extended this seven-day deadline to thirty days. Tr. at 1033. Lopez failed, however, to make any ineffective assistance claim until the current motion filed on August 15, 1994.[13] Accordingly, his motion is untimely.

In any event, the Court concludes that Lopez's ineffective assistance claim lacks merit. In order to prove ineffective assistance of counsel, a defendant must satisfy the standard set forth by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 686–88, 104 S.Ct. 2052, 2063–64, 80 L.Ed.2d 674 (1984). Specifically, *Strickland* requires Lopez to show that his counsel's performance fell below "an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2064, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

In determining whether Lopez's attorney's performance was objectively reasonable, "judicial scrutiny of counsel's performance must be highly deferential and 'a court must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Roccisano v. United States,* 92 Civ. 323, 1992 WL 178582, at *2, 1992 U.S.Dist. LEXIS 9949, at *4 (S.D.N.Y. July 9, 1992) (quoting *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065), *aff'd,* 992 F.2d 321 (2d Cir. 1993). "The court's central concern is not

with grading counsel's performance, but with discerning whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *United States v. Aguirre,* 912 F.2d 555, 561 (2d Cir.1990) (internal quotations omitted).

■ Lopez first claims that Cohen was unable to render adequate representation because he was distracted by his father's impending death. The Court finds, however, that Cohen ably and skillfully represented Lopez. In fact, although Cohen's father's death was a personal tragedy, the Court commends him for maintaining a professional demeanor throughout the proceeding and for zealously defending his client in the face of his misfortune. Accordingly, the argument that the prospect of his father's death caused Cohen to neglect his professional duties is meritless.

■ Lopez next contends that Cohen rendered ineffective representation by (1) failing to attack Agent Harrigan's testimony concerning the chain of custody of the cocaine; and (2) failing to inquire on cross-examination into whether seven kilograms of cocaine could fit into the soft-sided briefcase brought by the Government to the January 10th transaction. The Court finds these arguments unpersuasive.

■ To prove that counsel rendered a constitutionally inadequate performance the defendant must show more than that his attorney omitted a nonfrivolous argument, "for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 81, 130 L.Ed.2d 35 (1994). Rather, the defendant must demonstrate that "counsel omitted significant and obvious issues while

---

**12.** Rule 29 similarly provides that a motion for a judgment of acquittal must be made within seven days after the jury is discharged "or within such further time as the court may fix during the 7–day period." Fed.R.Crim.P. 29.

**13.** Lopez claims that he was given until August 15, 1994 to file "any and all post-trial motions."

Def.'s Reply in Supp. of Post Trial Mots. at 40. In fact, the August 15, 1994 deadline was for the purpose of submitting a motion for a new trial based on newly discovered evidence and did not extend the Rule 33 deadline for motions based on ineffective assistance of counsel.

pursuing issues that were clearly and significantly weaker." *Id.*

In the instant case, Cohen did, in fact, cross-examine Agent Harrigan about the chain of custody issue. Specifically, Cohen elicited from Agent Harrigan that he did not have a log sheet for the overnight evidence vault to show that evidence was placed in the vault prior to the January 10th transaction. Tr. at 566. Moreover, while Cohen did not ask any questions during trial about the size of the tote used to carry the cocaine, the Court concludes that this omission does not rise to the level of constitutionally inadequate assistance. *See Abdurrahman v. Henderson,* 897 F.2d 71, 74 (2d Cir.1990) ("Every non-frivolous claim need not be urged if 'counsel, as a matter of professional judgment, decides not to present those points.' ") (quoting *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983)).

 Lopez also contends that Cohen rendered ineffective assistance of counsel by operating under a conflict of interest. In particular, Lopez contends that, prior to taking on his case, Cohen previously had represented Zapata on narcotics charges resulting from the same undercover investigation that resulted in charges against Lopez, thereby creating a conflict of interest. It is well established that a defendant suffers ineffective assistance of counsel if his attorney "has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." *United States v. Levy,* 25 F.3d 146, 152 (2d Cir.1994). "In order to protect a defendant's right to conflict-free counsel, the trial court must initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest." *Strouse v. Leonardo,* 928 F.2d 548, 555 (2d Cir.1991).

In the case at bar, however, nothing in the trial record reveals the existence of an actual or potential conflict of interest sufficient to have triggered the Court's inquiry obligation. In fact, while Zapata may have been arrested during the course of the same DEA investigation as Lopez, the two shared no similarities other than the fact that they were both intended recipients of the cocaine shipped from Panama. Moreover, Zapata was charged in a different indictment from Lopez and did not testify against Lopez at trial. In fact, there is no evidence that Zapata and Lopez even knew each other. Lopez thus fails to submit any evidence that Cohen's prior connection to Zapata created either an actual or potential conflict of interest in this case. *Compare United States v. Levy,* 25 F.3d at 156 (finding conflict of interest where defense theory inculpated attorney's former client). Accordingly, Lopez's motion for a new trial or judgment of acquittal on the grounds of ineffective assistance of counsel is denied.

### III. Prior Bad Acts

 All three defendants next contend that a judgment of acquittal or new trial is warranted because the Court erred in precluding them from cross-examining Agent De La Cova at trial concerning (1) allegations made by a female defendant in an unrelated case that Agent De La Cova had engaged in sexual relations with her during the course of that investigation; and (2) a trial in the Eastern District of Virginia during which Agent De La Cova was prevented from testifying because he had lied about the death of a confidential informant and the existence of certain audiotapes. The Court concludes, however, that this argument is untimely.

As noted in Part II, *supra,* Rule 33 provides that motions for a new trial must be made within seven days after verdict except in the case of newly discovered evidence. Fed.R.Crim.P. 33. Newly discovered evidence consists of evidence that is discovered after trial and could not have been discovered sooner with the exercise of due diligence. *United States v. Dukes,* 727 F.2d at 38. Under this definition, neither of the two events described above qualify as newly discovered evidence. Rather, both incidents were known to defense counsel and, in fact, were brought to the Court's attention during the course of the second trial. At that time, the Court expressly precluded defense counsel from cross-examining Agent De La Cova as to either of these incidents. After trial, in the context of their original motion for a new trial, the defendants asserted that the Court

erred in precluding them from attacking Agent De La Cova's credibility. The Court denied this motion, finding that "[d]efense counsel's extensive cross-examination of Special Agent Rene De La Cova provided the jury with ample opportunity to assess the witness's credibility. Moreover, unconfirmed allegations of sexual misconduct and the facts concerning the prior case in Virginia were of 'marginal relevance' and were clearly prejudicial." *See* Order dated Sept. 20, 1993. As defendants have set forth no basis for the Court to revisit its prior rulings, their motion based on Agent De La Cova's prior misconduct is untimely.

## IV. Agent De La Cova's Conviction and Agent Matos' Misconduct

Defendants next argue that a judgment of acquittal or new trial is mandated by (1) Agent De La Cova's January 1994 conviction for the theft of government property; and (2) Agent Matos' placement on limited duty in May 1994 as a result of his relationship with a known cocaine trafficker. Specifically, defendants argue that a new trial is necessary to allow them the opportunity to impeach the agents' credibility with this newly discovered evidence. The Court disagrees.

First, the Court notes that evidence of the agents' misconduct would be inadmissible at a new trial because the conduct occurred subsequent to defendants' convictions and consisted of acts that were unrelated to the undercover investigation. Specifically, Agent De La Cova embezzled $700,000 in government funds on July 17, 1993, more than nine months after the defendants were convicted in the present action. Similarly, Agent Matos was placed on limited duty for sexual misconduct that occurred in May 1993, approximately seven months after the defendants' conviction. If the Court were to allow cross-examination into this post-trial conduct, it would open the door to new trial motions whenever a government witness committed a bad act or was convicted of criminal conduct occurring subsequent to trial, no matter how remote in time, place and subject matter to the original action. Accordingly, the Court finds that these incidents are irrelevant to the case at bar.

Second, even if Agent Matos' misconduct occurred prior to the defendants' conviction, Federal Rule of Evidence 608(b) would preclude the defendants from introducing extrinsic evidence of this misconduct at a new trial. *See* Fed.R.Evid. 608(b) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, ... may not be proved by extrinsic evidence."). Moreover, as Agent Matos' misconduct is not probative of truthfulness or untruthfulness, the defendants would be precluded even from inquiring into the incident on cross-examination. *See id.*

Third, even if evidence of the agents' misconduct were admissible to impeach their credibility on cross-examination, the Court holds that a new trial is not warranted in this case. It is well settled that new evidence that merely discredits a government witness, but does not contradict the prosecution's case, does not mandate a new trial. *See United States v. Sposato,* 446 F.2d at 781. In the case at hand, the new evidence would only be used to impeach the agents' credibility in general, and could not be used to impeach their credibility as to any specific statement or issue of fact. Thus, the defendants offer no evidence to contradict the agents' version of the facts in this case.

Moreover, the agents' testimony was extensively corroborated by other evidence at trial. Specifically, the Government introduced evidence of an intercepted telephone conversation in which an individual named "El Negro," at beeper number (212) 458–0453, was identified as a customer of a portion of the cocaine that was transferred from Panama. The Government also introduced telephone records that documented a call from Lopez's residence to the restaurant from which Agent De La Cova beeped "El Negro." In addition, Russell Benson, a special agent with the DEA, testified about his surveillance of the January 10th transaction. The Government also introduced a beeper taken from Lopez when he was arrested, upon which was typed the same telephone number that Agent De La Cova had paged earlier that evening. The evidence at trial further established that Ivan was carrying a piece of paper at the time of his arrest upon

which was written the numbers "458–0453" and the word "Guillo." Finally, the Government introduced Ivan's post-arrest statement in which he indicated that he knew that "someone" was at the January 10th transaction to participate in a drug deal. In view of this overwhelming evidence of the defendants' guilt,[14] the Court concludes that cross-examination concerning the agents' post-trial acts of misconduct probably would not lead to an acquittal. *United States v. Spencer*, 4 F.3d at 119 (stating that newly discovered evidence does not mandate a new trial unless the evidence "probably" would lead to an acquittal). Accordingly, defendants' motion for a judgment of acquittal or new trial based on these acts is denied.

## V. Allegations of Government Misconduct During the Undercover Investigation

■ Defendants next argue that a judgment of acquittal or new trial is mandated by newly discovered evidence of agent misconduct during the undercover investigation. Specifically, defendants make the following four allegations of agent misconduct: (1) Agents De La Cova and Matos failed to report that Restrepo and Sucic had given a quantity of jewelry and money to confidential informants during the course of the undercover investigation; (2) Agents De La Cova and Matos, possibly assisted by other DEA agents, imported 150 kilograms of cocaine from Panama which they then distributed for their own profit; (3) Agent Matos received $300,000 in cash from Vicky which he converted to his own use; and (4) Agents De La Cova and Matos stole $3,000 in cash recovered from Montoya during an undercover drug deal. For the reasons set forth below, the Court finds that none of these allegations warrant either a judgment of acquittal or a new trial.

14. In addition, in light of the evidence introduced at trial, defendants' motion for a judgment of acquittal on the ground that the Government had failed to establish a conspiracy is denied.

15. The Government argues that the jewelry was given to the First CI as a separate transaction

## A. Receipt of Jewelry and Money by the CIs

Defendants first contend that Agents De La Cova and Matos failed to report that Restrepo and Sucic had given a quantity of jewelry and cash to the First CI during the course of the undercover investigation. The Government concedes that the First CI apparently received "an unknown quantity" of jewelry from Restrepo and Sucic, but indicates that the First CI was supposed to pay Restrepo for the jewelry and that the jewelry transaction was unrelated to the undercover investigation. *See* letter from Assistant United States Attorney Bruce Ohr to the Hon. Shirley Wohl Kram of 2/27/95, at 9. The Government indicates further that "Restrepo may have made an additional payment of $10,000 to the informant, but the evidence of that payment is inconclusive." *Id.* Finally, the Government concludes that "while it is not possible to say for certain how much money the second confidential informant received from Restrepo [on the night of January 8, 1991], it seems highly unlikely that Agent Matos or any other agent would have had the opportunity to remove cash after the informant brought the cash to the DEA." *Id.* at 9 n. 2.

Assuming that Restrepo and Sucic gave a quantity of jewelry and cash to the CIs during the course of the undercover investigation,[15] the Court finds that this evidence does not mandate either a judgment of acquittal or a new trial. First, the Court notes that Restrepo and Sucic were not charged under the same indictment as the defendants and did not proceed to trial in this action. In fact, the undercover investigation involving Restrepo and Sucic did not relate in any way to the investigation of Lopez and the Buitragos. Moreover, neither of the CIs involved in the investigation of Restrepo and Sucic spoke to the defendants or testified at the trial in this action. Accordingly, the CIs'

from the narcotics transaction. Having reviewed the videotape and the DEA Reports, however, the Court suspects that Restrepo and Sucic gave the First CI jewelry and money in payment for the cocaine. In any event, the First CI concedes that he never paid Restrepo and Sucic for the jewelry.

misconduct would not be admissible during a new trial in the present case.

Second, while Agents De La Cova and Matos testified against the defendants at trial, any misconduct on their part involving the Restrepo and Sucic investigation would not be grounds for cross-examination in a new trial. Specifically, while it appears that Agent De La Cova failed to supervise the CIs properly, his negligence would not be proper grounds for attacking his credibility at trial because it does not call into question his character for truthfulness. *See* Fed. R.Evid. 608(b). Moreover, with respect to Agent Matos, defendants have provided the Court with no evidence that Agent Matos received money from the Second CI, or converted such money for his personal use. Accordingly, the Court finds that defendants' allegations with respect to the CIs' receipt of jewelry and money during the Restrepo and Sucic investigation does not merit a judgment of acquittal or a new trial.

## B. Importation of 150 Kilograms of Cocaine

Defendants also allege that Agents De La Cova and Matos imported 150 kilograms of cocaine during the undercover investigation and distributed them for their personal profit. In support of this contention, defendants argue that Arias can be heard in the background of intercepted telephone conversations # 622, recorded at 7:10 p.m. on January 8, 1991, telling an unidentified male that he had counted more than 400 kilograms of cocaine in New York. Defendants fail to quote the exact language used by Arias, however, and, having listened to conversation # 622, the Court cannot discern any statement by Arias indicating that he counted 400 kilograms of cocaine in New York.

Defendants contend further that the presence of 150 kilograms of cocaine in New York is also proven by the fact that DEA photographs of the cocaine display narcotics contained in white packaging. According to the Government, however, these photographs depict a portion of the 307 kilograms transported from Panama during the undercover investigation, which were packaged in white wrapping. In light of the Government's well-documented evidence concerning the importation of 307 kilograms of cocaine and the transfer of 150 kilograms to the Panamanian police, the Court concludes that defendants' allegation that Agents De La Cova and Matos distributed 150 kilograms of cocaine for their own profit lacks merit.

## C. Theft of $300,000 from Vicky

Defendants next contend that Agent Matos failed to report that Vicky had given him $300,000 in payment for cocaine delivered during an undercover transaction on January 9, 1991. Specifically, defendants point to an intercepted telephone conversation during which Rodriguez–Orejuela instructed Arias to give Vicky twenty-five kilograms of cocaine, wait to be paid, and then give her another twenty-five kilograms. According to defendants, this telephone conversation establishes that Arias was to give Vicky the cocaine only if she paid for it in advance. Defendants also point to conversation # 676 during which Arias informed Rodriguez–Orejuela that he had not received any money yet from Vicky, but that he planned to meet with her later that day to acquire the money. According to defendants, conversation # 676 demonstrates that Arias planned to meet with Vicky to exchange the drugs for the money. Defendants further contend that DEA agents permitted Vicky and Arias to avoid arrest because they would have confirmed that Vicky had transferred $300,000 to Agent Matos.

As the Government has established, however, the January 9, 1991 meeting during which Arias and Agent Matos transferred the cocaine to Vicky occurred at approximately 10:10 a.m., prior to the telephone call during which Arias told Rodriguez–Orejuela that he had not yet received the money from Vicky. Moreover, defendants have provided the Court with no evidence that Agent Matos permitted Vicky and Arias to escape arrest because they might have revealed the $300,000 theft. In fact, DEA agents attempted to locate and arrest Arias by maintaining surveillance at his last known residence and by attempting to trace certain telephone calls suspected of emanating from him. Under these circumstances, the Court concludes

that there is no evidence to support defendants' allegation that Vicky transferred $300,000 to Agent Matos.

### D. Theft of $3,000 from Montoya

Finally, defendants allege that Agents De La Cova and Matos stole $3,000 from the cash obtained from Montoya during the undercover drug transaction on January 9, 1991. Specifically, Lopez contends that Montoya had brought $50,000 in cash to the meeting, but that Agents De La Cova and Matos had turned in only $47,000. When OPR agents interviewed Montoya, however, he conceded that he had never counted the money that he had brought with him to the drug transaction. Accordingly, the Court finds that there is no evidence that the agents stole any of the money contained in Montoya's vehicle on January 9, 1991.[16] Accordingly, the Court finds that defendants' allegations of misconduct warrant neither a new trial nor a judgment of acquittal.

### CONCLUSION

For the reasons set forth above, defendants' motion for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, or a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, is denied. Defendant Lopez is directed to appear for sentencing on Wednesday, July 12, 1995 at 10:30 a.m. Defendant Jairo Alvarez–Buitrago shall appear for sentencing on Wednesday, July 19, 1995 at 10:30 a.m. Finally, defendant Ivan Alvarez–Buitrago will be sentenced on Wednesday, July 26, 1995, at 10:30 a.m.

SO ORDERED.

---

**16.** The Court notes that the Third Ten Day Report states that "[o]n or about January 9, 1991, DEA agents arrested Guillermo Montoya when he attempted to obtain forty kilograms of cocaine for a down payment of $50,000." *See* the Third Ten Day Report at 3. As the Third Ten Day Report does not state whether Montoya actually brought $50,000 to the transaction, however, the Court concludes that the Third Ten Day Report does not consist of credible evidence that Agents De La Cova and Matos stole $3,000 from Montoya.