NOT DESIGNATED FOR PUBLICATION

No. 122,040

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ROBERT EARL HUNTER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Ford District Court; SIDNEY R. THOMAS, judge. Opinion filed January 29, 2021. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Kurtis Wiard*, assistant solicitor general, *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., POWELL and GARDNER, JJ.

PER CURIAM: After a jury convicted Robert E. Hunter of one count of rape of a child under the age of 14 and two counts of indecent liberties with a child under the age of 14, a panel of this court affirmed his convictions. *State v. Hunter*, No. 114,856, 2016 WL 7178470, at *1 (Kan. App. 2016) (unpublished opinion). Hunter did not petition for review by our Supreme Court but filed a K.S.A. 60-1507 motion alleging ineffective assistance of trial and appellate counsel. After an evidentiary hearing, the district court denied that motion. Hunter now appeals, arguing that his trial attorneys failed to pursue newly discovered evidence and that his appellate attorney failed to petition for review of our decision on appeal. Finding no reversible error, we affirm.

1

*Factual and Procedural Background*

In 2014, the State charged Hunter with one count of rape of a child under 14 and two counts of indecent liberties with a child under the age of 14 based on sexual abuse allegations made by his girlfriend's 8-year-old granddaughter—J.C. Hunter was convicted as charged, then appealed unsuccessfully.

On appeal, a panel of this court summarized J.C.'s allegations:

"J.C., the victim, spent the summer of 2013 living in Bucklin with several family members including Hunter. J.C. was 8 years old. Hunter was 63 years old. J.C. moved to Bucklin shortly after the prior school year finished. At some point during the summer, Hunter began sexually fondling J.C. She remembered three distinct events where Hunter acted inappropriately.

"The first inappropriate action occurred when J.C. and Hunter were outside sitting on a bench in the backyard. J.C. asked to sit in Hunter's lap. After J.C. sat in his lap, Hunter put his hands down her pants. Hunter entered J.C.'s pants in the back and moved his hand toward her vagina. Hunter touched the outside of J.C.'s vagina and penetrated her vagina with his hand. J.C. told Hunter to stop, and she ran away from Hunter.

"The second inappropriate action occurred while Hunter was filling up a swimming pool. Hunter asked J.C. if she wanted to touch his 'cocka'—the word J.C. used for penis—with her hand. J.C. heard Hunter unzip his pants. It is unclear whether J.C. saw Hunter's penis. At one time J.C. stated she did not see his penis, but at another she stated his penis was sticking straight out of his pants.

"The third inappropriate action by Hunter occurred after Hunter woke J.C. up while the rest of the household was asleep. Hunter made her breakfast and, after eating, they went back to Hunter's bedroom to watch television. After they were inside the room, Hunter began kissing J.C. Hunter kissed her on the lips, neck, and between her breasts.

Hunter asked if J.C. liked what he was doing, and she told him to quit. J.C. heard Hunter unzip his pants. Then, J.C.'s brother entered the room and asked to go swimming. Hunter zipped up his pants.

"After the summer had ended, J.C. returned to live with her mother in Wichita, Kansas. J.C. had been acting up after she returned home. While J.C. and her mother were having dinner, J.C. told her mother that Hunter had touched her. J.C.'s mother contacted the Wichita sexual assault center. J.C. was taken to the Wichita police exploited and missing child unit to be interviewed. J.C. told the police the reason she finally blurted out that Hunter had hurt her was that 'I had it too long.'" 2016 WL 7178470, at *1.

The State introduced evidence of Hunter's prior crimes at the jury trial—his prior convictions for aggravated incest against his 10 and 12-year-old daughters. The State also admitted, without objection, a video of J.C.'s interview with Detective David Wertz in which she detailed the allegations outlined above.

J.C. testified on direct examination that Hunter had sexually abused her, but she could not remember at least two of the events that she had described to Wertz in her interview. During cross- and recross-examination, defense counsel—Louis Podrebarac—established that J.C. had trouble stating a timeline and identifying the number of times she was abused. J.C. became confused and gave conflicting accounts of how many times the abuse had occurred.

When the State tried during its redirect examination to remedy J.C.'s confusion, J.C. disclosed for the first time that she had kept a diary during the summer Hunter abused her:

"[State]: During that summer, when these things were happening to you, did you keep any kind of a diary, writing down things that happened to you during that summer?
"[J.C.]: Yeah.
"[State]: Did you write down the stuff that [Hunter] did to you?

3

"[J.C.]:  Yeah.

"[State]:  Did you ever show that to anybody?

"[J.C.]:  No.

"[State]:  And, tell me why you did that?

"[J.C.]:  Did what?

"[State]:  Wrote it down."

Podrebarac then objected to questions about the diary.

In a conversation outside the jury, Podrebarac argued that the diary had not been disclosed before trial and that the questioning went beyond the scope of his cross-examination. The State argued that it was unaware that J.C. would claim to have kept a diary of the event but still asked to pursue the line of questioning because defense counsel had challenged the timeline of the abuse on cross-examination. The district court sustained Podrebarac's objection and prevented the State from questioning J.C. about the diary. Although the district court did not instruct the jury to disregard the testimony, neither party mentioned the diary again.

The jury ultimately convicted Hunter as charged. Podrebarac did not move for a mistrial based on the testimony about the diary. Instead, after trial, Podrebarac filed an untimely motion for a new trial, arguing that the verdict was contrary to the evidence and that the district court erred in admitting evidence of Hunter's prior convictions. But Podrebarac did not mention the diary or argue that it was newly discovered evidence.

Before the district court ruled on that motion, Hunter hired a new attorney, Terry Malone. Malone filed an untimely amended motion for a new trial which asserted additional evidentiary grounds but did not mention the diary. The district court considered the merits of both motions but denied Hunter's motions for a new trial.

4

Before sentencing, Hunter sought a dispositional or downward durational departure, arguing that the habitual offender statute violated the United States Constitution's Eighth Amendment's prohibition of cruel and unusual punishment. The district court denied that motion and sentenced Hunter to serve three concurrent life sentences. And after a panel of this court affirmed Hunter's convictions and sentence, he did not petition for review by the Kansas Supreme Court.

Instead, Hunter filed a timely pro se K.S.A. 60-1507 motion, arguing that his trial and appellate counsel were ineffective. Hunter argued that Podrebarac was ineffective for failing to object to the admission of his prior crimes and of J.C.'s interview with police. Hunter also claimed that Malone failed to argue that his previous convictions did not warrant charging him as a habitual offender. In a supplemental motion, Hunter argued that Malone was also ineffective for failing to petition for review of this court's decision on appeal.

The district court appointed Eric Harman as counsel to represent Hunter on that motion then held a preliminary hearing to consider whether Hunter's K.S.A. 60-1507 arguments merited further consideration. At that hearing, Harmen acknowledged that the claims in Hunter's motion and supplemental motion were either unpersuasive or meritless. But Harman argued that within Hunter's claim about admission of the video was a colorable claim that Hunter's attorneys were ineffective for not having investigated the issue of the diary. The district court allowed Harman to brief that issue and the issue about Malone's alleged failure to petition for review in the Kansas Supreme Court. The district court also permitted Harman to file an amended K.S.A. 60-1507 motion and directed him to file a motion for a new trial if he found it "appropriate."

Harman then filed his amended K.S.A. 60-1507 motion, asking the district court to grant a new trial if it agreed that Hunter had ineffective trial counsel. Alternatively, Harman asked the district court to allow him to file a late petition for review if it found

that Hunter had ineffective assistance of appellate counsel. The district court set the matter for an evidentiary hearing.

Both Podrebarac and Malone testified at the evidentiary hearing. Hunter did not. Both attorneys admitted that they had not investigated the diary. Podrebarac testified that he recalled the trial testimony but never believed that J.C. had a diary because no one had referred to it before trial. Podrebarac believed that J.C. had invented the diary to bolster her testimony. The mention of the diary did not impact Podrebarac's defense strategy because he successfully kept the diary out of evidence, and the brief reference to it did not hinder his representation of Hunter. Podrebarac generally agreed, however, that a contemporaneous writing could be significant and that even if it incriminated his client, he would want to know about it.

Malone remembered very little about his representation of Hunter but testified that he had been hired to represent Hunter on "post-trial matters and an appeal." Malone was not asked why he did not raise the issue of the diary in his motion for a new trial. Malone testified that he did not recall noting any new evidence issues when he reviewed the trial transcripts. He testified, however, that an incriminating writing would be significant but that he would not try to get it admitted at trial.

After this court denied Hunter's direct appeal, Malone believed that he had fulfilled the scope of his retained services and no longer represented Hunter. He thought he either spoke with Hunter in person or wrote him a letter explaining that there was no basis to petition for review, but he was unsure. He admitted that he did not have a copy of that letter and that he may have failed to mail the letter to Hunter due to problems in his office. Malone did not petition for review because Hunter did not ask him to do so, and even had Hunter asked he would have declined to petition for review or to represent Hunter in that matter as he saw no viable issues warranting a petition. Malone told Hunter

that rather than petition for review, he should seek counsel who could pursue a K.S.A. 60-1507 motion alleging ineffective assistance of counsel.

Harman also testified at the K.S.A. 60-1507 hearing. He made a deliberate and strategic decision not to subpoena J.C. to testify at that evidentiary hearing. Still, Harman argued that because J.C. testified under oath that the diary existed, one should assume that she was telling the truth and that the diary existed. If the diary were silent about abuse, it would have been beneficial at trial.

When the district court asked whether the diary existed, the attorney for the State proffered that its existence remained unknown. The State explained that the sheriff's office and police department had confirmed that they never collected a diary or conducted a posttrial investigation into its existence.

The district court considered the merits of each argument, found the attorneys credible, then denied Hunter's motion, finding that counsel was not deficient and that Hunter was not prejudiced:

> "1. Because the diary would have only provided grounds for possible further impeachment of the victim, the diary (if it exists at all and even if it could be found) does not provide a ground for a new trial. The Defendant's Motion for New Trial is denied.
> "2. The legal counsel Mr. Hunter received from both Mr. Prodrebarac and Mr. Malone was reasonable, effective, and not deficient. Even if the representation provided by Mr. Podrebarac and/or Mr. Malone was somehow ineffective, the Court finds that this case was essentially called upon the jury to determine whether the victim's story or the defendant's story was credible, and thus any ineffective assistance would not have affected the outcome of the trial. The Petitioner's Motion Pursuant to K.S.A. 60-1507 is denied."

The written order did not mention the petition for review issue, but the district court orally found that Hunter did not ask Malone to petition for review. Even if he had, Malone's representation of Hunter ended after he filed his appellate brief, so Hunter would have been responsible for petitioning for review.

Hunter timely appeals.

*Did the district court err in denying Hunter's K.S.A. 60-1507 motion?*

*Standard of Review and Basic Legal Principles*

Because the district court held an evidentiary hearing on Hunter's K.S.A. 60-1507 motion, we review the court's findings of fact to determine whether they are supported by substantial competent evidence and are enough to support the court's conclusions of law. But we exercise unlimited review over the district court's conclusions of law and its decision to grant or deny the K.S.A. 60-1507 motion. *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018).

"To prevail on a claim of ineffective assistance of trial counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances and (2) prejudice." *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019). In considering deficiency, we recognize a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). A defendant alleging ineffective assistance of counsel "'must make more than conclusory contentions and must state an evidentiary basis in support of the claims or an evidentiary basis must appear in the record.'" *Holmes v. State*, 292 Kan. 271, 274, 252 P.3d 573 (2011).

*Podrebarac and Malone acted reasonably under the circumstances and thus provided effective assistance of trial counsel.*

Hunter first argues that both Podrebarac and Malone provided ineffective assistance of trial counsel by failing to move for a new trial based on the diary that J.C. disclosed for the first time at trial. Alternatively, Hunter argues that his attorneys were ineffective for failing to investigate the diary.

Our appellate courts do not generally second-guess strategic decision of counsel or require counsel to make futile arguments. See *Breedlove v. State*, 310 Kan. 56, 64-65, 445 P.3d 1101 (2019) (citing *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 [2013]; *Chamberlain v. State*, 236 Kan. 650, 658, 694 P.2d 468 [1985] [when counsel has no sound basis to believe that pretrial motion would have merit and no basis to make such motion, failure to make it is not ineffective assistance]). In fact, our Supreme Court has long held that strategic decisions are "virtually unchallengeable." *Flynn v. State*, 281 Kan. 1154, Syl. ¶ 5, 136 P.3d 909 (2006). But this principle applies only when an attorney's decisions are based on a thorough investigation of the law and facts. See *Wilson v. State*, 51 Kan. App. 2d 1, 18, 340 P.3d 1213 (2014). "'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *State v. Coones*, 301 Kan. 64, 74, 339 P.3d 375 (2014) (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied*, 467 U.S. 1267 [1984]).

The district court found that both Podrebarac and Malone acted reasonably in deciding that the diary was not significant enough to "use more resources to . . . find it." The district court also found that Podrebarac's decision to "continue with the trial instead of pursuing the issue of the diary" was a strategic decision reasonably made after

9

weighing the options available to him. The district court made the same ruling as to Malone's failure to raise the diary as grounds for relief at sentencing.

We find it unnecessary to address whether substantial competent evidence supports the district court's finding that the attorneys' decisions about the diary were strategic. Instead, we agree that the record shows that both Malone and Podrebarac acted reasonably and in a way that made investigating the diary unnecessary. We must not view an attorney's performance through the corrective lens of hindsight. *Rowland v. State*, 289 Kan. 1076, 1086, 219 P.3d 1212 (2009). And the test is not what the best or even a good attorney would have done but whether some reasonable attorney could have acted, under the circumstances, as the defense attorney acted. *Northcutt v. State*, No. 110,986, 2015 WL 1310712, at *6 (Kan. App. 2015) (unpublished opinion).

Podrebarac explained that he did not believe that a diary existed, as nothing in Hunter's case before trial suggested that a diary existed. He believed J.C. had claimed that a diary existed only to try to bolster her statements after his "vigorous" cross-examination. Podrebarac's strategy at trial was to highlight the inconsistencies in J.C.'s abuse allegations, which he was successful in doing. The record also shows that Podrebarac curtailed the prejudice, if any, that J.C.'s mention of a diary caused at trial by successfully objecting to the admission of the diary and to that line of questioning. Because his objection was sustained, Podrebarac did not reevaluate his trial strategy and did not feel his representation of Hunter was hindered. Neither he nor the State mentioned the diary again at trial after he objected.

As related to the motions for a new trial, Hunter failed to elicit testimony suggesting that either attorney failed to consider reasonable arguments to support those motions. Podrebarac testified that he met with Hunter, discussed what Hunter wanted to include, then followed Hunter's requests by including Hunter's arguments with his own in the motion for new trial. He also moved to declare the relevant sentencing statute

10

unconstitutional. After Podrebarac filed those motions, Hunter terminated Podrebarac and hired Malone, who filed an amended motion for a new trial based on additional evidentiary grounds. Although both attorneys filed their motions late, the district court still considered the merits of each argument before denying defense counsels' requests for a new trial.

Additionally, although neither attorney explicitly testified that they did not pursue the diary because they feared it would incriminate Hunter, the circumstances of this case would lead a reasonable attorney to act on that possibility. Malone testified that he would not try to have a contemporaneous writing admitted at trial. Podrebarac did not answer whether he believed the diary contained inculpatory or exculpatory evidence as he did not believe any diary existed.

Yet, J.C.'s testimony under oath that she kept a diary at the time of the abuse and that she wrote down what Hunter did to her is evidence that the diary existed and that it included evidence damaging to Hunter:

> "[State]: Did it take you a little while to get used to talking about what [Hunter] did to you?
> "[J.C.]: Yeah.
> "[State]: Did you go to counseling for that?
> "[J.C.]: What is counseling?
> "[State]: Like, to see a therapist?
> "[J.C.]: Yes.
> "[State]: During that summer, when these things were happening to you, did you keep any kind of a diary, writing down things that happened to you during that summer?
> "[J.C.]: Yeah.
> "[State]: Did you write down the stuff that [Hunter] did to you?
> "[J.C.]: Yeah.
> "[State]: Did you ever show that to anybody?
> "[J.C.]: No.

11

"[State]: And, tell me why you did that?

"[J.C.]: Did what?

"[State]: Wrote it down."

This testimony presents several scenarios. Either J.C. was not truthful about the diary, in which event it did not exist or did not show Hunter's abuse, or she was telling the truth, in which event the diary would seriously incriminate Hunter. If it were the former, J.C.'s credibility would have been singed a bit. But if it were the latter, Hunter's goose would be cooked. Either way, we agree with the district court that Hunter's trial counsel acted reasonably in the midst of trial when faced with this surprise evidence. Cf. *Coones*, 301 Kan. at 75 (finding decision not to investigate the origination of a call a reasonable and tactical decision based on counsel's testimony that the investigation could have led to further confirmation of a call prejudicial to defendant's case); *Wilson*, 51 Kan. App. 2d at 23-24 (finding a reasonable decision conceivably existed not to introduce a letter containing possibly exculpatory evidence because the letter also implicated defendant in the crime charged). Hunter bears the burden to show error, yet he failed to subpoena J.C., he chose not to testify, and the attorneys adequately explained why their acts were reasonable at the time.

*Hunter fails to establish prejudice.*

Even if we assume that Hunter's trial attorneys were ineffective with regard to the testimony about the diary, reversal is not warranted. The United States Supreme Court has explained that defense counsel's ineffectiveness does not always require reversal:

"Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96.

12

Additionally, our Supreme Court has recently emphasized that the focus is on fundamental fairness:

> "'[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding' and 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.' *Strickland*, 466 U.S. at 696." *Balbirnie v. State*, 311 Kan. 893, 900, 468 P.3d 334 (2020).

To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with a reasonable probability—that is, a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

Further, to establish the right to a new trial based on newly discovered evidence, a criminal defendant must meet a two-part test: (1) The newly proffered evidence could not have been produced at trial with reasonable diligence and (2) the newly proffered evidence is of such materiality that it would likely produce a different result upon retrial. The district court must assess the credibility of the newly proffered evidence when deciding whether the new evidence is material, and appellate courts do not reassess the district court's credibility determination. Our courts generally review a district court's decision to deny a motion for a new trial based on newly discovered evidence for an abuse of discretion. *State v. Lyman*, 311 Kan. 1, 16, 455 P.3d 393, *cert. denied* 141 S. Ct. 174 (2020).

The State argues that the diary could have been produced during trial, so it does not qualify as newly discovered evidence, as the first part of the test requires. We agree. The burden of proof is on the defendant to show the alleged newly discovered evidence could not, with reasonable diligence, have been produced at trial. *State v. Ji*, 251 Kan. 3, 38, 832 P.2d 1176 (1992). J.C. testified about the diary at trial. Although her mid-trial

13

disclosure surprised all, Hunter fails to show that the diary could not have been produced during trial with reasonable diligence after a timely continuance. See *State v. Smith*, 39 Kan. App. 2d 64, 67, 176 P.3d 997 (2008) (finding newly discovered evidence met the first prong because it came into existence after the jury started deliberations).

As for the materiality of the diary, Hunter argues that the district court erred in relying on our Supreme Court's decision in *State v. Reed*, 256 Kan. 547, 886 P.2d 854 (1994). In that case, our Supreme Court held a that a petitioner should not be granted a new trial based on newly discovered evidence if that evidence could be used only to "impeach or discredit the testimony of a witness." 256 Kan. at 560; see *State v. Richard*, 235 Kan. 355, 363, 681 P.2d 612 (1984) ("A new trial is not granted on the basis of newly discovered evidence which merely tends to impeach or discredit the testimony of a witness."). J.C.'s testimony about her diary could have been used to impeach her if she had no diary or if she had a diary that did not incriminate Hunter.

But as Hunter points out, our Supreme Court has more recently ruled that impeachment evidence may merit a new trial when such evidence is key to a defense. See *State v. Norton*, 277 Kan. 432, 442, 85 P.3d 686 (2004). In *Norton*, however, the new evidence could have produced a different result because the State presented so little direct evidence of Norton's guilt. That is not the case here, as the State presented much evidence independent of the diary that showed Hunter's guilt.

In arguing materiality, Hunter asks us to assume that J.C. had a diary but that the diary did *not* corroborate her accusations against him. But he has no evidence in support of that speculation. The evidence is to the contrary—that J.C. kept a diary and that she wrote in it what Hunter did to her.

But even if J.C. had no diary or her diary failed to corroborate her accusations against Hunter, it does not necessarily follow that the abuse J.C. testified to did not

14

happen. Her testimony independently provides ample evidence of Hunter's guilt, even without the diary. If J.C. had no diary or if she had a diary that failed to implicate Hunter, that contradiction to her trial testimony would have impeached her, but it would have been so slight that it would not have provided grounds for a new trial because it would not have sufficiently weakened the State's case. Cf. *Johnson v. Jones*, 4:12cv457-RH/CAS, 2015 WL 5004609, at *8 (N.D. Fla. 2015) (unpublished opinion), *aff'd sub nom. Johnson v. Sec'y, Florida Dep't of Corr.*, 680 Fed. Appx. 869, 874 (11th Cir. 2017) (unpublished opinion) (applying this reasoning in a child sex abuse case in which petitioner claimed new evidence that sibling had not seen abuse merited a new trial because it differed from the victim's allegations). Although J.C. was confused about the timing or frequency of the abuse, her testimony that Hunter abused her was clear. So even if the diary exists but does not confirm J.C.'s abuse allegations, it would not necessarily establish that Hunter did not abuse J.C.

This is true even though Hunter's convictions rested heavily on J.C.'s testimony. As the district court recognized, Podrebarac managed to highlight the inconsistencies in J.C.'s testimony on cross-examination. And on direct examination, J.C. testified that she could not remember most of the abuse that Hunter committed. Still, the jury decided to convict Hunter as charged. And the jury only briefly heard that a diary existed. So any prejudicial effect that the testimony may have caused was minimal and was appropriately limited as a result of Podrebarac's timely objection and argument not to allow further questioning. Hunter fails to show that the evidence merited a new trial or that the jury would not have convicted him if the diary had been produced.

We thus affirm the district court's decision denying Hunter's claims arising from testimony about the diary.

*Malone was not ineffective for failing to petition for review.*

Finally, Hunter argues that Malone provided ineffective assistance of appellate counsel because he failed to petition for review in our Supreme Court after Hunter mailed him a letter directing him to do so.

In *Kargus v. State*, 284 Kan. 908, 169 P.3d 307 (2007), our Supreme Court explained that an attorney has no statutory duty to petition for review after an unsuccessful appeal, but in some cases an attorney may be found ineffective if the failure to petition for review results in a failure to preserve their client's right to a proceeding. 284 Kan. at 924-25. When considering a claim that appellate counsel was ineffective for failing to petition for review, we apply "an adapted version of the *Strickland* standard to judge whether a criminal defendant received ineffective assistance of counsel during the course of a direct appeal." *State v. Patton*, 287 Kan. 200, 224, 195 P.3d 753 (2008). Our Supreme Court outlined these standards:

> "(1) If a defendant has requested that a petition for review be filed and the petition was not filed, the appellate attorney provided ineffective assistance; (2) a defendant who explicitly tells his or her attorney not to file a petition for review cannot later complain that, by following instructions, counsel performed deficiently; (3) in other situations, such as where counsel has not consulted with a defendant or a defendant's directions are unclear, the defendant must show (a) counsel's representation fell below an objective standard of reasonableness, considering all the circumstances; and (b) the defendant would have directed the filing of the petition for review. A defendant need not show that a different result would have been achieved but for counsel's performance." *Kargus*, 284 Kan. at 928.

In applying this test, we still consider the prejudicial effect of an attorney's deficient performance, but this prejudice standard differs from the one we apply in a standard ineffectiveness claim:

"'[I]f appointed or retained counsel has failed to file or perfect a direct appeal by a criminal defendant, we will presume the existence of prejudice. This is not, however, the same as a finding of prejudice per se, requiring application of the third *Ortiz* exception. The defendant must still demonstrate that, but for counsel's failure, he or she would have taken a timely direct appeal. The defendant need not show, as he or she would have had to show if we were using the *Strickland* standard as our benchmark, that such a timely direct appeal would have been successful.' [Citations omitted]." *State v. Perry*, 303 Kan. 1053, 1060, 370 P.3d 754 (2016).

*Kargus* provides that "'"[a] defendant properly informed of his appellate rights may not 'let the matter rest' . . . and then claim that he did not waive his rights to appeal."'" 284 Kan. at 922. Under this principle, Hunter's claim necessarily fails.

Malone's testimony at the evidentiary hearing on Hunter's K.S.A. 60-1507 motion is uncontradicted. He consulted with Hunter about this court's decision on appeal and Hunter's options to continue to pursue his appellate claims. Malone spoke with Hunter about the appellate decision and how he should proceed. He told Hunter to hire a new attorney to file a habeas corpus petition alleging ineffective assistance of counsel. Malone did not recall receiving any communication asking him to petition for review and even had Hunter asked him to do so, he would have declined. Malone thought that he did not have to petition for review because his duties as retained counsel ended when this court filed its opinion on direct appeal.

Although Hunter argues that Malone's testimony in this regard was inconsistent and unclear, he has never denied that Malone advised him of his appellate rights, and he does not refute that fact on appeal. Similarly, Hunter claims that the State failed to prove that Malone was not retained to represent Hunter beyond Hunter's appeal in this court. But it was Hunter's burden, not the State's, to establish that Malone acted ineffectively. See *Kargus*, 284 Kan. at 917. Similarly, Hunter does not argue that Malone perjured himself when he testified that he was hired to represent Hunter in posttrial matters and in

17

an appeal to this court. Hunter offered no testimony to the contrary, so he shows no evidence by which we could reverse the district court's decision.

Hunter attacks the consistency and clarity of Malone's testimony, tacitly asserting that his allegations in his supplemental and amended K.S.A. 60-1507 motions were more credible than Malone's conflicting testimony. But Hunter did not testify at the evidentiary hearing, so the district court made a credibility finding only on Podrebarac's and Malone's testimony. We do not reassess credibility. See *White*, 308 Kan. at 508-09 (remanding *Kargus* type of ineffectiveness claim for a credibility determination in the district court); *Beauclair v. State*, 308 Kan. 284, 302-04, 419 P.3d 1180 (2018) (credibility of a victim's recantation not properly decided by appellate court). Because Hunter chose not to testify at the evidentiary hearing, the district court did not make a finding about his credibility and we cannot make one on appeal.

Affirmed.